UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
                                             :

AMERICAN AIRLINES, INC.; AMR        :
CORPORATION; UNITED AIR LINES, INC.; UAL :
CORP.; US AIRWAYS GROUP, INC.; US     :
AIRWAYS, INC.; DELTA AIR LINES, INC.;   :
CONTINENTAL AIRLINES, INC.; COLGAN AIR, :       No. 08 CV 10646 (AKH)
INC.; GLOBE AVIATION SERVICES      :
CORPORATION; GLOBE AIRPORT SECURITY  :
SERVICES, INC.; HUNTLEIGH USA CORP.; ICTS :
INTERNATIONAL NV; THE BOEING COMPANY; :     **COMPLAINT**
THE MASSACHUSETTS PORT AUTHORITY;  :
AND THE METROPOLITAN WASHINGTON   :    This action relates to:
AIRPORT AUTHORITY,               :    In re September 11 Litigation,
                                    :    21 MC 101 (AKH)
             Plaintiffs/Aviation Parties,  :

                     v.            :

FEDERAL BUREAU OF INVESTIGATION,   :
and ROBERT S. MUELLER in his Official    :
Capacity as Director of the Federal Bureau of  :
Investigation,                      :
                                     :
                 Defendants.      :
                                     :
                                     :
---------------------------------------------------------------- X

      Plaintiffs American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; UAL Corp.;

US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.;

Colgan Air, Inc.; Globe Aviation Services Corporation; Globe Airport Security Services, Inc.;

Huntleigh USA Corp.; ICTS International NV; The Boeing Company; the Massachusetts Port

Authority; and the Metropolitan Washington Airport Authority (collectively, the "Aviation

Parties") allege as follows:

## **INTRODUCTION**

This action asks the Court to set aside the final agency action of the Federal Bureau of Investigation (the "FBI") refusing to permit the Aviation Parties to depose Special Agent Kenneth Williams in the property damage, business loss, personal injury, and wrongful death litigation arising out of the terrorist attacks of September 11, 2001 (the "September 11 terrorist attacks"). All such claims have been consolidated before this Court in *In re September 11 Property Damage and Business Loss Litigation,* 21 MC 101 (AKH) (the "September 11 Litigation").

Special Agent Williams is an FBI Special Agent who was assigned to the agency's Phoenix Field Office in 2000 and 2001. During this time period, he conducted an investigation of persons known to have ties to al Qaeda and Usama Bin Laden who were training at civil aviation schools in Arizona. Special Agent Williams concluded that foreign students, operating under the sponsorship of al Qaeda, were in the United States potentially preparing for terrorist attacks on civil aviation. He documented these factual findings and conclusions in the so-called "Phoenix Memo", which he disseminated within the FBI in July 2001.

Special Agent Williams has firsthand knowledge of facts that are probative of critical issues in the September 11 Litigation, including causation, the foreseeability of the September 11 terrorist attacks, and whether the Aviation Parties should have derivative immunity from liability under the Federal Tort Claims Act (the "FTCA").

Yet, in a boilerplate letter dated October 15, 2008, the FBI refused to permit the Aviation Parties to depose Special Agent Williams.

2

## PARTIES

Plaintiffs American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; UAL Corp.; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; Colgan Air, Inc.;  Globe Aviation Services Corporation; Globe Airport Security Services, Inc.; Huntleigh USA Corp.; ICTS International NV; The Boeing Company; the Massachusetts Port Authority; and the Metropolitan Washington Airport Authority are all defendants in the September 11 Litigation, which is consolidated before this Court pursuant to the Air Transportation Safety and System Stabilization Act, Pub. L. No. 107-42, 115 Stat. 230 (2001) (the "ATSSA").  Each of the Aviation Parties is a commercial air carrier, airport security company, or aircraft manufacturer.

Defendants the FBI, an agency of the United States Department of Justice, and Robert S. Mueller, in his official capacity as the Director of the FBI, denied the Aviation Parties' request to depose Special Agent Williams as a fact witness in the September 11 Litigation.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.,* which authorizes the Court to hold unlawful and set aside final FBI actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, including the agency's unwarranted refusal to permit discovery that has been requested in accordance with the so-called *"Touhy* regulations" set forth at 28 C.F.R. §§ 16.21 *et seq.*

2.      Jurisdiction and venue are also proper in this Court pursuant to Section §

408(b)(3) of the ATSSSA, which vests the United States District Court for the Southern District of New York with original and exclusive jurisdiction over all actions brought for any claim resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001, including the refusal to permit the deposition of a third-party witness with firsthand knowledge of facts relevant to the September 11 Litigation. Consistent with the ATSSSA, in the September 11 Litigation, "the general discovery process must be controlled by the very capable judges of the Southern District of New York, the only court with jurisdiction over the Civil Plaintiffs' causes of action." *U.S. v. Moussaoui,* 483 F.3d 220, 239 (4th Cir. 2007).

## FACTUAL ALLEGATIONS

### BEFORE SEPTEMBER 11, SPECIAL AGENT WILLIAMS INVESTIGATED EVIDENCE THAT INDICATED THAT AL QAEDA HAD SENT OPERATIVES TO CIVIL AVIATION SCHOOLS IN ARIZONA

3.     Kenneth Williams was an FBI Special Agent assigned to the Phoenix Field Office of the FBI in the years 2000 and 2001.

4.     In or about the year 2000, Special Agent Williams observed that an "inordinate number of individuals of investigative interest," many of whom had ties to al Qaeda, were attending civil aviation schools in Arizona. Memorandum from Kenneth J. Williams to Counterterrorism at 1 (July 10, 2001) (the "Phoenix Memo") (attached as Exhibit 1).

5.     In April 2000, Special Agent Williams initiated a field investigation into foreign students who were training or had trained at civil aviation schools in Arizona. *Id.* After gathering some factual information on these individuals, Special Agent Williams concluded that it was possible that they were in Arizona as part of "a coordinated effort

4

by Usama Bin Laden ("UBL") to send students to the United States to attend civil aviation universities and colleges." *Id.* at 1. Special Agent Williams further concluded that, once trained, such individuals would be well-positioned "to conduct terror activity against civil aviation targets." *Id.* at 2.

6.      In July 2001, Special Agent Williams summarized the information that he had gathered and documented his concerns regarding foreign students who were training in civil aviation in the United States in possible preparation for terrorist activity in an Electronic Communication. *Id.* This Electronic Communication later became known as the "Phoenix Memo."

7.      In July 2001, Special Agent Williams sent the Phoenix Memo to the FBI's Radical Fundamentalist and Usama Bin Laden Units, and to others at FBI Headquarters and the FBI's New York Field Office.

8.      In the Phoenix Memo, Special Agent Williams requested that the FBI take certain steps to follow up on his investigation, including that the FBI (a) share intelligence information on foreign students training in civil aviation in the United States with other members of the intelligence community; (b) establish liaisons with civil aviation schools across the country; and (c) seek the authority to obtain visa information on foreign students attending civil aviation schools in the United States. *Id.* at 2.

9.      Before September 11, 2001, the FBI did not take any further investigatory steps with respect to the information contained in the Phoenix Memo, as Special Agent Williams had recommended. *See* The National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States,* 282 (2004) ("*The 9/11*

*Commission Report"*); Office of the Inspector General, Department of Justice, *A Review of the FBI's Handling of Intelligence Information Related to the September 11 Attacks*, ch. 3 (2004) (*"The OIG Report"*).

10.     Before September 11, 2001, the FBI did not publicly disclose the information contained in the Phoenix Memo.  Nor did it disclose the contents of the Phoenix Memo to the other agencies in the Intelligence Community or to the Federal Aviation Administration (the "FAA").  *See The 9/11 Commission Report* at 282; *The OIG Report*, ch. 3.

## IN 2001, HIJACKERS HANI HANJOUR AND NAWAF AL HAZMI LIVED IN PHOENIX, WHERE HANJOUR TRAINED TO FLY JETLINERS

11.     Future September 11 hijacker Hani Hanjour was born in the Kingdom of Saudi Arabia and was a citizen of the Kingdom of Saudi Arabia in 2001.

12.     On September 11, 2001, after he and four other terrorists hijacked American Airlines Flight 77 and assumed control of the jetliner, Hanjour piloted and intentionally crashed the jetliner into the Pentagon.

13.     In the year 2000, future September 11 hijackers Nawaf al Hazmi and Khalid al Mihdhar were identified as potential terrorists with links to al Qaeda by the Central Intelligence Agency (the "CIA"), one of the federal intelligence agencies.

14.     Hanjour and Hazmi lived together in Phoenix, Arizona from approximately December 2000 through March 2001.

15.     From January 2001 through March 2001, Hanjour received pilot training at Jet Tech Pan Am International Flight Academy ("Jet Tech"), a training and flight simulator facility in the Phoenix area for students who wanted to learn to fly jetliners.

16.     Upon information and belief, Hanjour lived and trained in Phoenix during the time period during which Special Agent Williams was gathering intelligence information concerning foreign students who were training in civil aviation in possible preparation for terrorist attacks.

17.     Before he began training at Jet Tech in 2001, Hanjour obtained a commercial pilot's license.

18.     Between the beginning of January 2001 and the end of March 2001, staff at Jet Tech repeatedly reported concerns about Hanjour to an FAA inspector, John Anthony.  Among other concerns, Jet Tech staff expressed concern that Hanjour was not capable of safely piloting a commercial jetliner.  Staff at Jet Tech also asked the FAA to verify the authenticity of Hanjour's commercial pilot's license, because they had observed that Hanjour did not speak English with enough fluency to meet the FAA's language requirements for the license that he held.

19.     By the early summer of 2001, Hanjour and Hazmi had relocated to the East Coast of the United States, where they were joined by several of the other September 11 hijackers, including Ahmed al Ghamdi (one of the hijackers of United Air Lines Flight 175), Abdul Aziz al Omari (one of the hijackers of American Airlines Flight 11), Khalid al Mihdhar (one of the hijackers of American Airlines Flight 77), Salem al Hazmi (one of the hijackers of American Airlines Flight 77), and Majed Moqed (one of the hijackers of American Airlines Flight 77).  *See The 9/11 Commission Report* at 229-30.  In the spring or early summer of 2001, this group of hijackers moved to Paterson, New Jersey, where several of them shared an apartment.  *Id.*

20.     Upon information and belief, following the September 11 terrorist attacks,

Special Agent Williams participated in the FBI's investigation into the training that Hanjour received at Jet Tech.

THE SEPTEMBER 11 LITIGATION

21.     Multiple claimants have filed negligence actions against the Aviation Parties seeking to recover for injuries and fatalities, property damage, and business loss that resulted from the September 11 terrorist attacks.  Pursuant to the ATSSSA, their claims were consolidated before the Honorable Alvin K. Hellerstein, United States District Judge for the Southern District of New York.

22.     Plaintiffs in the September 11 Litigation seek to impose billions of dollars in liability against the Aviation Parties for their alleged failure to detect and halt the terrorists who attacked the United States on September 11, 2001.

23.     Plaintiffs in the September 11 Litigation have alleged or have indicated that they are likely to allege, *inter alia,* that the Aviation Parties should have anticipated that terrorists with the capability of piloting jetliners would hijack commercial flights and then intentionally pilot the hijacked jetliners into specific targets on the ground in coordinated suicide attacks.  Plaintiffs further allege that the Aviation Parties should have implemented security procedures to effectively defend against suicide attacks of this kind.

24.     Plaintiffs in the September 11 Litigation have also alleged or have indicated that they are likely to allege that the Aviation Parties had primary responsibility to assess the threat posed by al Qaeda to domestic civil aviation, and that the Aviation Parties could have prevented the September 11 terrorist attacks if they had properly carried out this responsibility.

8

## SPECIAL AGENT WILLIAMS HAS FIRSTHAND KNOWLEDGE OF FACTS RELEVANT TO THE ISSUE OF PROXIMATE CAUSE

25.     The Aviation Parties anticipate that Special Agent Williams will provide testimony in the September 11 Litigation that is directly relevant to the issue of causation.

26.     It is a basic tort law principle that to recover under a theory of negligence, plaintiffs in the September 11 Litigation must establish that the Aviation Parties' conduct was the proximate cause of their injuries.   In short, plaintiffs must establish that the Aviation Parties' conduct was a "substantial factor" in bringing about plaintiffs' alleged damages. *See* Restatement (Second) of Torts § 431 (1965).

27.     The Aviation Parties are of the view that the calculated, criminal conduct of the terrorists who carried out the September 11, 2001 attacks is the primary and fundamental cause of the terrorist attacks.

28.     The Aviation Parties are entitled to present evidence that establishes that the causal effect of the intentional, criminal conduct of the terrorists, particularly when considered together with the effect of the conduct of the FBI and other federal agencies before September 11, 2001, is so substantial that it precludes the conduct of the Aviation Parties from being a substantial factor in bringing about plaintiffs' alleged damages.

29.     The Aviation Parties intend to introduce evidence demonstrating that before September 11, 2001, the FAA was monitoring the intelligence information available to it and had concluded that there was little risk of a suicide attack on civil aviation within the United States.

30.     Special Agent Williams is anticipated to testify that before September 11, 2001, neither he nor, to his knowledge, anyone at the FBI disclosed to the FAA or to the

9

Aviation Parties the intelligence information that he had gathered indicating that foreign students were training in civil aviation in the United States in possible preparation to commit terrorist attacks sponsored by al Qaeda.

31.    Based on Special Agent Williams' anticipated testimony and the other evidence that the Aviation Parties intend to present, the jury in the September 11 Litigation would be entitled to conclude that the FAA would have changed its assessment of the countermeasures that were appropriate to guard against a terrorist attack against domestic civil aviation if the FAA had been advised before September 11, 2001 of the information contained in the Phoenix Memo.  The jury would further be entitled to conclude that, in response, the FAA would have required the Aviation Parties to modify the aviation security measures that were in place and that the modified countermeasures mandated by the FAA would have prevented or deterred the September 11 terrorist attacks.

32.    The Aviation Parties anticipate that Special Agent Williams will testify that before September 11, 2001, he did not know that staff at Jet Tech had raised concerns about Hani Hanjour, one of their students from Saudi Arabia, who did not appear to be qualified to hold a commercial pilot's license yet was training to fly jetliners.

33.    The Aviation Parties anticipate that Special Agent Williams will testify that if he had received information before September 11, 2001 regarding Jet Tech's staff's concerns about Hanjour and his flight training, it would have been consistent with FBI procedures and Special Agent Williams' own investigatory practices for him to initiate an investigation into Hanjour, his associates, and his activities in Phoenix.

34.    Based on Special Agent Williams' anticipated testimony and the other

10

evidence that the Aviation Parties intend to present, the jury in the September 11 Litigation would be entitled to conclude that Hanjour and possibly other September 11 hijackers would have been apprehended by United States law enforcement officials if Special Agent Williams had learned of Hanjour's training at Jet Tech before September 11, 2001.

35.    The Aviation Parties intend to present other evidence in the September 11 Litigation that establishes that: (a) that the CIA had identified Nawaf al Hazmi and Khalid al Mihdhar as likely terrorists, who had ties to al Qaeda and were possibly present in the United States by March 2000; (b) Hanjour lived with Hazmi in Phoenix for a period of time beginning in December 2000 and ending in March 2001; (c) that Hanjour met with and lived with several of the September 11 hijackers, including Hazmi and Mihdhar, during the spring and summer of 2001 in the eastern United States; and (d) that by the end of August 2001, the CIA had shared intelligence information about Hazmi and Mihdhar's likely terrorist activities and whereabouts with the FBI.

36.    The Aviation Parties further intend to present evidence to the jury in the September 11 Litigation that establishes that if al Qaeda had learned that there was a risk that their plot to commit the September 11 terrorist attacks had been detected by law enforcement and/or that some of its operatives had been apprehended in the United States, al Qaeda would have cancelled the plot. *See The 9/11 Commission Report* at 247, 276.

37.    Special Agent Williams is anticipated to testify that before September 11, 2001, the FBI did not publicly disclose the intelligence information that is reflected in the Phoenix Memo.  Based in part on his testimony, the jury in the September 11 Litigation

would be entitled to conclude that al Qaeda would have cancelled the plot to commit the September 11 terrorist attacks if the FBI had publicly disclosed that it had intelligence information that indicated that foreign students were training in civil aviation in the United States, possibly in preparation to commit terrorist attacks sponsored by al Qaeda.

### SPECIAL AGENT WILLIAMS CAN OFFER TESTIMONY RELEVANT TO THE ISSUE OF FORESEEABILITY

38.     Special Agent Williams can offer testimony in the September 11 Litigation that is probative of the critical issue of foreseeability.

39.     It is a fundamental principle of tort law that a plaintiff cannot recover in a negligence action without proving that its alleged damages were a "reasonably foreseeable consequence of the defendant's act or omission." *Gordon v. City of New York*, 70 N.Y.2d 839, 841, 517 N.E.2d 1331, 1331 (1987) (citing *Danielenko v. Kinney Rent A Car*, 57 N.Y.2d 198, 204, 441 N.E.2d 1073, 1075 (1982)).

40.     The Aviation Parties anticipate that Special Agent Williams' testimony, together with other evidence, will establish both that the September 11 terrorist attacks were not reasonably foreseeable to the Aviation Parties, and that the Aviation Parties' conduct with respect to civil aviation security was reasonable in light of the intelligence information on the terrorist threat that was available to the Aviation Parties on and before September 11, 2001.

41.     As pled above, Special Agent Williams is anticipated to testify that before September 11, 2001, neither he nor, to his knowledge, anyone at the FBI disclosed to anyone outside of the agency that he had gathered intelligence information that indicated that foreign students were training in civil aviation in the United States in possible

preparation to commit terrorist attacks sponsored by al Qaeda.

42.     Special Agent Williams is anticipated to further testify that before September 11, 2001, neither he nor, to his knowledge, anyone at the FBI recommended to the FAA that the FAA require additional or modified civil aviation security measures based on the intelligence information that he had gathered indicating that individuals with ties to al Qaeda were training in civil aviation in the United States.

43.     Special Agent Williams' anticipated testimony will tend to establish that the FBI determined that it was not necessary to make modifications to the civil aviation security system based on the intelligence information available to the FBI as of September 11, 2001.  Such evidence helps to rebut the contention of plaintiffs in the September 11 Litigation that the Aviation Parties should have implemented security measures that were different from and additional to those required by the FAA during the same time period. *See Eiseman v. State*, 70 N.Y.2d 175, 191 (1987) (holding it improper to impose a higher duty on a private actor to predict criminal behavior of parolee than that borne by "society's experts in making such predictions – the correction and parole officers").

44.     At the time of the September 11 terrorist attacks, under federal law, the FBI was jointly responsible with the FAA for assessing the seriousness of potential terrorist threats to civil aviation:

> The Administrator of the Federal Aviation Administration and the Director of the Federal Bureau of Investigation jointly shall assess current and potential threats to the domestic air transportation system.  The assessment shall include consideration of the extent to which there are individuals with the capability and intent to carry out terrorist or related unlawful acts against that system and the

> ways in which those individuals might carry out those acts.
> The Administrator and the Director jointly shall decide on
> and carry out the most effective method for continuous
> analysis and monitoring of security threats to that system.

49 U.S.C. § 44904(a) (2000).

45.     The FBI also contributed to the process by which the FAA determined whether new security countermeasures were necessary to protect civil aviation. The FBI evaluated the intelligence information that it had collected and determined whether the threat of terrorist attacks had materially changed, such that any of the intelligence information should be shared with the FAA. The FAA, in turn, would direct commercial airlines, airport authorities and aircraft manufacturers to implement any amended security measures that the FAA determined were an appropriate response to the intelligence information that the FBI had conveyed to it.

46.     Because the FBI was one of the agencies with statutory responsibility for assessing the terrorist threat to domestic civil aviation on and before September 2001, the determinations that the FBI made concerning the terrorist threat are probative of whether the Aviation Parties' conduct with respect to the countermeasures they implemented to deter the same threat was reasonable. *See* 2 *Wigmore on Evidence*, §§ 461, 442 (Chadbourne rev. 1970) (directing that relevant evidence of whether a defendant acted reasonably includes evidence of the conduct of others under substantially similar circumstances).

47.     Special Agent Williams can also provide important and relevant context to the deliberations of the jury in the September 11 Litigation on the issue of foreseeability.

48.     Plaintiffs in the September 11 Litigation have indicated that they intend to

14

proceed as if the Aviation Parties had access to all of the same intelligence information as the federal intelligence agencies at the time of the terrorist attacks. The Aviation Parties expect that Special Agent Williams will testify, contrary to plaintiffs' assumptions, that while he had information indicating that al Qaeda operatives were receiving civil aviation training in the United States in possible preparation for a terrorist attack, neither he nor the FBI disclosed this information to the FAA or the Aviation Parties before September 11, 2001.

49.     Special Agent Williams is further expected to testify that although he had firsthand knowledge of the information contained in the Phoenix Memo, he did not foresee the September 11 terrorist attacks. The jury should be permitted to weigh Special Agent Williams' testimony on this point when it considers whether the Aviation Parties should have reasonably foreseen the same threat, despite the fact that the Phoenix Memo and other intelligence information that had been gathered by the federal intelligence agencies was not made available to them before September 11, 2001.

## SPECIAL AGENT WILLIAMS HAS FIRSTHAND KNOWLEDGE OF FACTS RELEVANT TO THE ISSUE OF DERIVATIVE IMMUNITY

50.     The Aviation Parties anticipate that Special Agent Williams will provide testimony that is directly relevant to the issue of whether the Aviation Parties have derivative immunity under the FTCA.

51.     As pled above, on and before September 11, 2001, the FBI and the FAA had joint statutory responsibility for assessing the terrorist threat to civil aviation in the United States.

52.     During this time period, the FBI also participated in the process through

15

which the FAA established countermeasures to guard against the terrorist threat to civil aviation. The FBI evaluated the intelligence information that it had gathered and determined which portion of that information, if any, indicated that there had been a material change in the terrorist threat to civil aviation, such that it was appropriate to communicate certain intelligence information to the FAA.

53.     Pursuant to the FTCA, plaintiffs in the September 11 Litigation are precluded from asserting claims against the FAA and the FBI based upon the agencies' assessments of the terrorist threat to civil aviation on and before September 11, 2001.

54.     The FTCA provides that the federal government of the United States of America (the "Government") and its agents shall not be held liable "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government...." 28 U.S.C. § 2680 (a) (2008).

55.     As the United States Court of Appeals for the Second Circuit has recently recognized, a party acting under the direction of a federal agency has derivative immunity pursuant to the FTCA, if that party can satisfy a three-part test. The defendant in question must show that:

> (1) [a federal agency] made certain discretionary policy judgments that resulted in reasonably precise specifications that were based on the purposes that the regulatory regime in question seeks to accomplish; (2) [the agency] supervised and controlled the [defendant's] implementation of these reasonably precise specifications; and (3) [the defendant] was not aware of dangers about which [the agency] was unaware.

*In re World Trade Ctr. Disaster Site Litig.*, 521 F. 3d 169, 188-189, 198 (2d Cir. 2008).

56.     In the context of the September 11 Litigation, to demonstrate that they are

entitled to derivative immunity, the Aviation Parties are required to show, in part, that they had no greater knowledge of the potential terrorist threat to civil aviation than the FAA and the FBI, the two federal agencies that shared responsibility for assessing the terrorist threat to domestic civil aviation as of September 11, 2001.

57.    Accordingly, the Aviation Parties must be able to present evidence establishing what intelligence information the FAA and the FBI had (and did not have) regarding the terrorist threat to domestic civil aviation before September 11, 2001.

58.    Special Agent Williams' testimony will help establish whether or not the Aviation Parties were alerted to any intelligence information on the terrorist threat to civil aviation about which either the FBI or the FAA was unaware.

59.    As an FBI agent who, in the year 2001, had gathered and documented intelligence information indicating that known associates of al Qaeda were training in civil aviation in the United States in possible preparation for terrorist attacks, Special Agent Williams can testify as to a portion of the information that the FBI had before September 11, 2001 regarding the terrorist threat to domestic civil aviation.

60.    The Aviation Parties also intend to ask Special Agent Williams whether, before September 11, 2001, he or, to his knowledge, anyone at the FBI disclosed any of the information that he had gathered indicating that known associates of al Qaeda were training in civil aviation to either the FAA or to the Aviation Parties.  Special Agent Williams' testimony in response to these questions will be probative of what intelligence information regarding the terrorist threat was available to the Aviation Parties and the FAA before September 11, 2001.

17

THE AVIATION PARTIES REQUESTED PERMISSION FROM THE FBI TO
DEPOSE KENNETH WILLIAMS

61.     On May 5, 2008, the Aviation Parties advised the FBI of their intention to depose Special Agent Williams by a letter addressed to the office of the United States Attorney for the Southern District of New York (the "May 5 Letter").  *See* Letter from Desmond T. Barry, Jr. to Beth E. Goldman, Sarah S. Normand and Jeannette A. Vargas (May 5, 2008) (attached as Exhibit 2).

62.     The Aviation Parties addressed the May 5 Letter to the office of the United States Attorney for the Southern District of New York pursuant to an agreement with that office, which has been counsel for the Government as intervener in the September 11 Litigation since 2002.  *See Mariani v. United Air Lines, Inc.*, No. 01 Civ. 11628 (AKH) (S.D.N.Y. July 24, 2002) (provisional order granting Government's motion to intervene and for consolidation).

63.     The Aviation Parties provided the May 5 Letter to the office of the United States Attorney for the Southern District of New York with the understanding that the request would be forwarded to the appropriate FBI and Government staff for their consideration.

64.     In making the request for deposition testimony, the Aviation Parties complied with the applicable "*Touhy* regulations" set forth in 28 C.F.R. §§ 16.21 *et seq.*, by attaching a detailed supporting affidavit that identifies the reasons the testimony sought is relevant to the September 11 Litigation, and the proposed topics for the deposition. *See* Ex. 2, May 5 Letter.

18

## THE FBI'S REFUSAL TO GRANT THE AVIATION PARTIES'
## REQUEST WAS ARBITRARY AND CAPRICIOUS

65.    Through its counsel, the United States Attorney for the Southern District of New York, the FBI issued a boilerplate letter dated October 15, 2008 refusing the Aviation Parties' request to depose Special Agent Williams (the "Refusal Letter").  *See* Letter from Michael J. Garcia to Desmond T. Barry, Jr. (October 15, 2008) (attached as Exhibit 3).

66.    Much of the language the FBI used in the Refusal Letter and the reasons it provides for barring Special Agent Williams from being deposed are identical to five separate letters, all dated May 7, 2007, that the FBI issued refusing to allow five other FBI fact witnesses to be deposed in the September 11 Litigation.  The FBI's refusal to allow these five witnesses to be deposed in the September 11 Litigation is currently being reviewed by this Court in *American Airlines, Inc. v. FBI*, No. 07 Civ. 7051 (AKH).

67.    The Refusal Letter states that the FBI is barring the requested deposition of Special Agent Williams from going forward for seven reasons: (1) the testimony sought is not relevant to the claims or defenses of any party to the September 11 Litigation because it includes pre-September 11 intelligence or threat information regarding threats to civil aviation; (2) some of the information is protected from disclosure because it involves classified national security information, matters protected by the law enforcement investigative privilege, or information that would tend to reveal a confidential source or information; (3) some of the information contained in the testimony sought may be protected by the deliberative process, attorney-client, work product, or other privilege; (4) the request for testimony is overbroad and unduly

burdensome; (5) some of the testimony sought "may contain information that originated with other Government departments or agencies," requiring the FBI to coordinate its response with these departments or agencies; (6) the testimony sought is duplicative to the extent that the information is available from publicly available secondary sources, such as *The 9/11 Commission Report*; and (7) the breadth of proposed topics exceeds the scope of permissible discovery under Federal Rule of Civil Procedure 26(b).   Ex. 3, Refusal Letter at 2-3.

68.    The FBI's blanket refusal to permit the Aviation Parties to question Special Agent Williams about facts that are directly relevant to critical issues in the September 11 Litigation is an arbitrary and capricious final agency action that should not be permitted to stand.

69.    The FBI's assertion that the requested testimony is not relevant to any claim or defense in the September 11 Litigation because it includes pre-September 11 intelligence or threat information regarding threats to civil aviation ignores central issues in this litigation, including whether the terrorist attacks were reasonably foreseeable before September 11, 2001.

70.    Contrary to the FBI's suggestions, the Aviation Parties are not seeking to have Special Agent Williams disclose privileged or otherwise protected information.  To the extent that individual questions posed to Special Agent Williams might implicate privileged information, the Aviation Parties anticipate that counsel for the FBI will attend the deposition and instruct him on how to answer those specific questions without revealing privileged information.

71.    The FBI's objection that the requested testimony may implicate privileged

information is directly inconsistent with its assertion that the same information is available from secondary sources. As the FBI concedes, much of the information about which the Aviation Parties seek to depose Special Agent Williams has already been widely publicly disclosed.

72.    A redacted copy of the Phoenix Memo was introduced during the criminal trial of *U.S. v. Moussaoui,* Crim. No. 01-455A (LMB) (E.D.Va.) and remains publicly available at a website maintained by the United States District Court for the Eastern District of Virginia.

73.    A redacted copy of the Phoenix Memo is appended to *The Report of the Joint Inquiry Into the Terrorist Attacks of September 11, 2001*, Rept. No. 107- 351, 107th Congress, 2D Session H. Rept. No. 107-792 ("*The Joint Intelligence Committee Report*"), which was issued by the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence and remains publicly available.

74.    The events surrounding Special Agent Williams' investigation into students at civil aviation schools in Arizona and related to the drafting and dissemination of the Phoenix Memo are described in publicly available secondary sources, such as *The 9/11 Commission Report* and *The Joint Intelligence Committee Report*. Such publicly available sources also cite Special Agent Williams as an authority on the topics about which the Aviation Parties seek to depose him.

75.    The FBI's contention that the Aviation Parties could seek the information about which it seeks to depose Special Agent Williams from other sources overlooks the fact that secondary sources are not satisfactory substitutes for evidence taken directly from witnesses with firsthand knowledge of the underlying facts. Direct testimony is less

likely to raise issues regarding the admissibility of the information as evidence at trial and is more likely to prove persuasive to the trier of fact.  Deposition discovery also would permit all parties in the September 11 Litigation to ask specific questions targeted to elicit information directly relevant to the issues at stake in this litigation, such as proximate cause and the reasonableness of the Aviation Parties' conduct.

76.     Counsel for the FBI is very familiar with the September 11 Litigation and the issues pertaining to sensitive security or privileged information that it implicates.  The office of the United States Attorney General for the Southern District of New York has been an active participant in the litigation and discovery for almost six years.  Given the familiarity of the FBI's counsel with the September 11 Litigation, the inconvenience involved in preparing for and attending one deposition is insufficient to preclude Special Agent Williams' deposition from going forward.

77.     Any coordination that the FBI might need to do with other Government departments or agencies to permit the deposition to go forward is likely to be negligible and not unduly burdensome, given that the Aviation Parties are seeking to depose Special Agent Williams regarding an investigation he conducted and about facts about which he has personal knowledge.  Moreover, the intelligence information that he gathered for the FBI does not appear to have been shared with any agency outside of the FBI during the pre-September 11, 2001 time period about which the Aviation Parties seek to question him.

## FIRST CAUSE OF ACTION

(Review and Reversal Under the Administrative Procedure Act)

78.     The Aviation Parties incorporate by reference all allegations set forth in

22

paragraphs 1 to 77 above.

79.     The FBI's blanket refusal to permit the Aviation Parties to depose FBI Special Agent Kenneth Williams in the September 11 Litigation constitutes a final agency action for the purposes of the Administrative Procedure Act.

80.     The FBI's blanket refusal to permit the deposition to go forward at all is an agency action or failure to act in an official capacity.

81.     The FBI's refusal to permit the deposition requested by the Aviation Parties to go forward in the September 11 Litigation should be set aside because that action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and because it is an action that deprives the Aviation Parties of evidence that is important to their defense of very serious allegations that have been made against them in litigation of national importance.

## SECOND CAUSE OF ACTION

(Writ of Mandamus)

82.     The Aviation Parties incorporate by reference all allegations set forth in paragraphs 1-81 above.

83.     The Aviation Parties' claim for permission to proceed with the requested deposition of FBI Special Agent Kenneth Williams is clear and certain.

84.     The FBI has ignored and/or violated the standards delimiting the manner in which their discretion to permit the requested third-party deposition to go forward in the September 11 Litigation can be exercised by issuing a boiler plate refusal, barring the requested deposition from going forward.

85.     No adequate remedy is available other than the issuance of a writ of

23

mandamus directing that the FBI grant permission for the requested deposition to go forward.

## **PRAYER FOR RELIEF**

WHEREFORE, the Aviation Parties as plaintiffs in this action respectfully request that this Court set aside the final agency action of the FBI refusing to permit the deposition sought by the Aviation Parties to proceed or, in the alternative, that the Court issue a writ of mandamus ordering the FBI to permit the requested deposition to go forward, and to award such other and further relief as the Court deems proper.

Dated:  December 8, 2008
        New York, New York

                                    CONDON & FORSYTH LLP

                                    By: _____
                                          Desmond T. Barry, Jr. (DB 8066)
                                          7 Times Square
                                          New York, NY 10036
                                          Telephone: 212-490-9100
                                          Facsimile: 212-370-4453
                                          dbarry@condonlaw.com

                                          -and-

                                          DEBEVOISE & PLIMPTON LLP
                                          Roger Podesta
                                          Maura K. Monaghan
                                          919 Third Avenue
                                          New York, New York 10022
                                          Telephone: 212-909-6000
                                          Facsimile: 212-909-6836

                                          *Counsel for American Airlines Inc. and
                                          AMR Corporation*

24

*Counsel for United Air Lines, Inc., and UAL Corp*
QUIRK & BAKALOR, P.C.
Jeffrey Ellis
845 Third Avenue, 15th Floor
New York, New York 10022
Telephone: 212-319-1000
Facsimile: 212-319-1065

MAYER BROWN LLP
Michael R. Feagley
71 S. Wacker Drive
Chicago, Illinois 60606
Telephone: 312-782-0600
Facsimile: 312-701-7711

*Counsel for US Airways Group, Inc. and US Airways, Inc.*
CAMPBELL, CAMPBELL, EDWARDS & CONROY,
PROFESSIONAL CORPORATION
Richard P. Campbell
One Constitution Plaza, Third Floor
Boston, Massachusetts 02129
Telephone: 617-241-3000
Facsimile: 617-241-5115

*Counsel for Delta Airlines*
GALLAGHER GOSSEEN FALLER & CROWLEY
Michael J. Crowley
1010 Franklin Avenue, Suite 400
Garden City, New York 11530-2927
Telephone: 516-742-2500
Facsimile: 516-742-2516

*Counsel for Continental Airlines*
LECLAIRYAN
Peter B. Van Deventer, Jr.
Two Penn Plaza East
Newark, New Jersey 07105-2249
Telephone: 973-491-3600
Facsimile: 973-491-3555

*Counsel for Colgan Air, Inc.*
CONNELL FOLEY, LLP
Jeffrey W. Moryan
85 Livingston Avenue
Roseland, New Jersey 07068
Telephone: 973-535-0500
Facsimile: 973-535-1685

*Counsel for Huntleigh USA Corp.*
SUSMAN GODFREY LLP
H. Lee Godfrey
Charles Eskridge
Suite 5100
1000 Louisiana Street
Houston, Texas 77002-5096
Telephone: 713-651-9366
Facsimile: 713-654-6666

*Counsel for Globe Aviation Services Corporation and Globe Airport Security Services, Inc.*
JONES HIRSCH CONNORS & BULL P.C.
James P. Connors
One Battery Park Plaza
New York, New York 10004
Telephone: 212-527-1000
Facsimile: 212-527-1680

LIBBY HOOPES, P.C.
Douglas Brooks
715 Federal Street
Boston, Massachusetts 02110
Telephone: 617-338-9300
Facsimile: 617-338-9911

LOCKE LORD BISSELL & LIDDELL LLP
Gary W. Westerberg
111 South Wacker Drive
Chicago, Illinois 60606-4410
Telephone: 312-443-0700
Facsimile: 312-443-0336

*Counsel for ICTS International NV*
MCLAUGHLIN & STERN  LLP
David Sass
260 Madison Avenue – 18th Floor
New York, New York 10016
Telephone: 212-448-1100
Facsimile: 212-448-0066

*Counsel for The Boeing Company*
PERKINS COIE LLP
Thomas J. McLaughlin
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Telephone: 206-583-8888
Facsimile: 206-583-8500

RICHARDS KIBBE & ORBE LLP
Brian Fraser
One World Financial Center
New York, New York 10281-1003
Telephone: 212-530-1800
Facsimile: 212-530-1801

PAUL, WEISS, RIFKIND, WHARTON, GARRISON LLP
Robert A. Atkins
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3183
Facsimile: 212-492-0183

*Counsel for Massachusetts Port Authority*
O'MELVENY & MYERS LLP
Mark Wood
400 South Hope Street
Los Angeles, California 90071
Telephone: 213-430-6220
Facsimile: 213-430-6675

GOODWIN PROCTER LLP
Christopher D. Moore
Exchange Place
53 State Street
Boston, Massachusetts 02109-2881
Telephone: 617-570-1000
Facsimile: 617-523-1231